**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**vs.**

**SHANRIE CO., INC., et al.,**

**Defendants.**                                             **No. 05-CV-306-DRH**

<u>**ORDER**</u>

**Herndon, District Judge:**

### I. <u>Introduction</u>

On April 25, 2005, the United States filed this action in this Court alleging that Defendants violated the **Fair Housing Act, as amended, 42 U.S.C. §§ 3601-3619 ("FHA")** by failing to design and construct the Applegate Apartments ("Applegate") in Swansea, Illinois in compliance with the FHA's requirements regarding accessibility for persons with disabilities. On June 23, 2006, the United States filed a motion for partial summary judgment. (Doc. 79.) On that same day, Defendants Shanrie Co., Inc. ("Shanrie"), Dan Sheils ("Sheils"), and Netemeyer Engineering Associates, Inc. ("Netemeyer") filed a motion for partial summary judgment (Doc. 80) and Defendant Thouvenot, Wade & Moerchen, Inc. ("TWM") filed a motion for summary judgment (Doc. 81). Because the issues are so intertwined, this memorandum will address all three motions.

In addition, Defendants Shanrie Co., Inc. and Dan Sheils filed a motion for oral

argument (Doc. 91) on their motion for partial summary judgment (Doc. 80).  The Court was able to resolve the motion without the assistance of oral arguments; therefore, Defendants motion for oral argument is **DENIED**. (Doc. 91.)

## II. <u>Background</u>

The United States contends that each of the Defendants played some role in the design or construction of Applegate.  The following is undisputed: Shanrie built and has owned Applegate since construction began.  Sheils is the president of Shanrie.  Sheils oversaw all aspects of the design and construction of Applegate.  Netemeyer prepared architectural plans for Applegate.  TWM had a contract with OC Development, the developer who prepared the site and sold it to Shanrie.  TWM never had a contract with Shanrie, but provided assistance during the zoning process.

Construction of the first building at Applegate was completed in the fall of 2002.  As of September 30, 2004, Applegate consisted of five apartment buildings with 20 ground floor units.  None of the ground floor units in the first five units have an accessible entry, even today.  The ground floor units are accessible only by stairs.  Building 6 was completed in the fall of 2005.  After this lawsuit was filed in October 2004, Sheils modified the plans for Building 6 to include a ramp to the ground floor units.  However, the United States alleges that even this ramp is not in compliance with the FHA.  In June of 2006, Building 7 was under construction; construction on Building 8 had not yet begun.

### III. <u>Summary Judgment Standard</u>

Summary judgment is proper where the pleadings and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." **FED. R. CIV. P. 56(c);** *Oats v. Discovery Zone*, **116 F.3d 1161, 1165 (7th Cir. 1997)** (citing *Celotex Corp. v. Catrett*, **477 U.S. 317, 322 (1986)**).  The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law.  *Santaella v. Metro. Life Ins. Co.*, **123 F.3d 456, 461 (7th Cir. 1997)** (citing *Celotex*, **477 U.S. at 323**).  In reviewing a summary judgment motion, the Court does not determine the truth of asserted matters, but rather decides whether there is a genuine factual issue for trial.  *Celex Group, Inc. v. Executive Gallery, Inc.*, **877 F. Supp. 1114, 1124 (N.D. Ill. 1995) (Castillo, J.)**.  The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the nonmovant.  *Regensburger v. China Adoption Consultants, Ltd.*, **138 F.3d 1201, 1205 (7th Cir. 1998)** (citing *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 255 (1986)**).

In response to a motion for summary judgment, the nonmovant may not simply rest on the allegations in his pleadings.  Rather, she must show through specific evidence that an issue of fact remains on matters for which she bears the burden of proof at trial.  *Walker v. Shansky*, **28 F.3d 666, 670-71 (7th Cir. 1994),** *aff'd*, **51 F.3d 276** (citing *Celotex*, **477 U.S. at 324**).  No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to

return a verdict for that party.  If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." ***Anderson***, **477 U.S. at 249-50** (citations omitted); *accord **Starzenski v. City of Elkhart**, 87 F.3d 872, 880 (7th Cir. 1996)*; ***Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994)**.  However, when all the Court has before it are the diametrically opposed statements of the parties on the critical and ultimate issues of fact, the Court, not in a position to make credibility findings, must pass the case to the next phase of litigation.

## IV. <u>Analysis</u>

### <u>     </u> A.      The Fair Housing Amendments Act of 1988

The Fair Housing Amendments Act of 1988 ("FHAA") added "handicap"as another form of discrimination outlawed by the original Fair Housing Act, which was passed in 1968. The "FHAA" made it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of– (A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter." **42 U.S.C. § 3604(f)(1)**.  In addition, **Section 3604(f)(2)** makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of–(A) that person."  The accessibility requirements include making the public use and common

use portions of such dwellings readily accessible, ensuring that all doors are wide enough for wheelchairs to pass through and that all premises have certain "features of adaptive design." ***Id.* at § 3604f(3)(C).**[1]

Congress granted the Secretary of HUD the authority to promulgate regulations to implement the FHA and provide technical assistance to help achieve the Act's accessibility requirements. ***Id.* at §§ 3601, 3604(f)(5)(C).**  HUD issued implementing regulations in 1989, which discussed the FHA's design and construction requirements. **24 C.F.R. § 100.200.**  Guidelines setting minimum standards for compliance with the design and construction requirements were issued two years later. **56 Fed. Reg. 9473-9515.**

Although the FHAA was enacted nearly 20 years ago, few cases have addressed some of the issues presented in this case.  Therefore, as background, the Court begins by considering the intent of Congress in its enactment of the FHAA.  According to the House of Representatives Committee Report ("House Report"), Congress intended that the FHAA be a "clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream." **H.R. Rep. 100-711, 18**.  In addition, the House Report on the FHAA provides, "[b]ecause persons with mobility impairments need to be able to get into

---

[1] These features include: "(I) an accessible route into and through the dwelling; (II) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations; (III) reinforcements in bathroom walls to allow later installation of grab bars; and (IV) usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space." ***Id.***

and around a dwelling unit (or else they are in effect excluded because of their handicap), the bill requires that in the future covered multifamily dwellings be accessible and adaptable . . . These modest requirements will be incorporated into the design of new buildings, resulting in features which do not look unusual and will not add significant additional costs." *Id.*  The House Report makes it clear that the FHAA prohibits acts that have the effect of causing discrimination, not just intentional discrimination.[2]  Furthermore, the United States Supreme Court has found that when interpreting the Fair Housing Act, courts are to give effect to the "broad remedial intent of Congress embodied in the Act." *Havens Realty Corp. V. Coleman*, 455 U.S. 363, 380 (1982).

**B.     Motions for Summary Judgment**

This matter comes before the Court on three pending motions for summary judgment. (Docs. 79, 80, 81.)  The United States' motion for partial summary judgment asserts that the design and construction of Applegate violates the FHA and that each of the Defendants is liable for the violations. (Doc. 79.)  The United States is seeking summary judgment on the issue of liability only.   The United States

---

[2]"The Committee understands that housing discrimination against handicapped persons is not limited to blatant, intentional acts of discrimination.  Acts that have the effect of causing discrimination can be just as devastating as intentional discrimination. A person using a wheelchair is just as effectively excluded from the opportunity to live in a particular dwelling by the lack of access into a unit and by too narrow doorways as by a posted sign saying "No Handicapped People Allowed." In Alexander v. Choate, the Supreme Court observed that discrimination on the basis of handicap is 'most often the product, not of invidious animus, but rather of thoughtlessness and indifference--of benign neglect' and mentioned 'architectural barriers' as one factor that can have a discriminatory effect." **H.R. Rep. 100-711, 25.**

essentially argues that 1) Applegate is subject to the accessibility requirements mandated by the FHA; 2) Applegate was not designed and constructed in compliance with the FHA; 3) Defendants are not entitled to the site impracticality defense; 4) each Defendant is liable for the violations; and 5) Defendants have engaged in a pattern or practice of discrimination and/or a denial of rights to a group of persons pursuant to **42 U.S.C. § 3614**.  (Doc. 79.)  Defendants Shanrie, Sheils, and Netemeyer's motion for partial summary judgment argues that the Defendants are entitled as a matter of law to the site impracticality defense. (Doc. 80.)  Finally, Defendant TWM's motion for summary judgment maintains that TWM's role in the design and construction of Applegate was so limited that it should not be held liable for any elements of the design and construction that are not in compliance with the FHA. (Doc. 81.)  For the following reasons, the United States' motion (Doc. 79) is granted in part and denied in part, Defendants Shanrie, Sheils, and Netemeyer's motion is denied (Doc. 80), and Defendant TWM's motion is denied (Doc. 81).  Aside from a few peripheral arguments addressed below, it is basically undisputed that the Applegate Apartment complex is not in compliance with the accessibility requirements contained in the FHA.   The core dispute in this case revolves around two issues.  First, whether Defendants are entitled to an accessibility exemption under the site impracticality defense.  And second, whether each Defendant was a participant in the design and construction of Applegate to the extent that it may be held liable under the Act.

**C. Defendants Shanrie, Sheils, and Netemeyer's Motion for Partial Summary (Doc. 80):**

*1. The Site Impracticality Defense*

The statutory language of the FHA does not contain an exemption based on site impracticality. However, the Department of Housing and Urban Development's implementing regulations provide that all covered multifamily dwellings must be served by an accessible building entrance on an accessible route "unless it is impractical to do so because of the terrain or unusual characteristics of the site**."** **24 C.F.R. § 100.205(a)**. The regulations place the burden of establishing impracticality on the person[s] who designed or constructed the housing. ***Id.*** There are two tests that may be used to establish site impracticality: the individual building test and the site analysis test. In this case, the Defendants attempt to apply the site analysis test to establish impracticality. HUD's Final Fair Housing Accessibility Guidelines[3] ("Guidelines") lay out the steps that should be followed in conducting a

---

[3] HUD adopted the guidelines pursuant to **42 U.S.C. § 3604(f)(5)(C)** to provide builders and developers with technical guidance on how to comply with the accessibility requirements of the FHAA. The Guidelines were issued after notice and comment. "The purpose of the Guidelines is to describe minimum standards of compliance with the specific accessibility requirements of the Act." **56 Fed. Reg. at 9476.** Although the Guidelines are not mandatory, they set out minimum standards and provide insight into HUD's interpretation of its own regulations. The Guidelines are "intended to provide a safe harbor for compliance with the accessibility requirements of the Fair Housing Amendments Act . . . . Builders and developers may choose to depart from the Guidelines, and seek alternate ways to demonstrate that they have met the requirements of the Fair Housing Act." ***Id.* at 9473.**

site analysis test to establish site impracticality.[4]   Even if the site is found to be impractical, "at least 20% of the total ground floor units in nonelevator buildings, on any site, must comply with the guidelines." **56 Fed. Reg. at 9503.**

*2. Exclusion of March 21, 2006 Site Analysis Conducted by Marsha Maller*

Defendants Shanrie, Sheils, and Netemeyer's motion for partial summary judgment (Doc. 80) asserts that Defendants are entitled to the site impracticality defense based on a site analysis test performed by Marsh J. Maller, a licensed

---

[4]  The Final Fair Housing Accessibility Guidelines provide:

(ii) Site analysis test. Alternatively, for a site having multiple buildings, or a site with a single building with multiple entrances, impracticality of providing an accessible entrance served by an accessible route can be established by the following steps:

(A) The percentage of the total buildable area of the undisturbed site with a natural grade less than 10% slope shall be calculated. The analysis of the existing slope (before grading) shall be done on a topographic survey with two foot (2') contour intervals with slope determination made between each successive interval. The accuracy of the slope analysis shall be certified by a professional licensed engineer, landscape architect, architect or surveyor.

(B) To determine the practicality of providing accessibility to planned multifamily dwellings based on the topography of the existing natural terrain, the minimum percentage of ground floor units to be made accessible should equal the percentage of the total buildable area (not including floodplains, wetlands, or other restricted use areas) of the undisturbed site that has an existing natural grade of less than 10% slope.

(C) In addition to the percentage established in paragraph (B), all ground floor units in a building, or ground floor units served by a particular entrance, shall be made accessible if the entrance to the units is on an accessible route, defined as a walkway with a slope between the planned entrance and a pedestrian or vehicular arrival point that is no greater than 8.33%

**56 Fed. Reg. 9503-04.**

engineer and an employee of Defendant TWM.[5]  Based on Ms. Maller's analysis, Defendants argue that only 12 units - of the total 32 units that will ultimately be built at Applegate - must meet the accessibility requirements of the FHA.  Defendants never suggest that the first five buildings in the Applegate complex are accessible. Instead, they posit that Building Six is nearly accessible and that Buildings Seven and Eight, which were under construction at the time this motion was submitted, will be fully accessible.  Hence, they argue, once the entire apartment complex is complete and utilizing the impracticality defense, they will be in full compliance with the FHA.

Defendants offer various arguments as to why the site analysis performed by Ms. Maller should result in a finding that only 37% of the total ground floor units at the property - rather than 100% - must comply with the accessibility requirements of the FHA.  However, the Court finds that Defendants motion should be denied based on the following reasons.

First and foremost, on February 28, 2007, Magistrate Judge Donald G. Wilkerson issued a Report and Recommendation recommending that Plaintiff's motion to exclude evidence regarding Defendant TWM's March 21, 2006 site analysis be granted as a discovery sanction pursuant to **FED. R. CIV. P. 37(c)(1)**.  (Doc. 110.) Plaintiff argued in its motion seeking to exclude Ms. Maller's site analysis (Doc. 59) that the site analysis was an attempt by TWM to circumvent the Court's March 17,

---

[5]It is worth noting that although Ms. Mallor is an employee of TWM, TWM did not join this motion.  Instead, TWM filed its own separate motion for summary judgment. That motion does not rely upon the site impracticality defense.  (Doc. 81.)

2006 Order that ruled that TWM was barred from offering expert testimony under **FED. R. EVID. 702, 703,** and **705**, unless it came from an expert disclosed as such prior to February 16, 2006, the deadline the Court had established for making **FED. R. CIV. P. 26(a)(2)** disclosures.[6]   Judge Wilkerson agreed and issued a Report and Recommendation, which the Court adopted (Doc. 111), recommending that the March 21, 2006 site analysis be excluded from use at trial, at a hearing, or to support a motion.   Although the HUD Guidelines state that site impracticality "can" be established by the use of the site analysis test, rather than "shall," and, therefore, it might be possible to argue that there are alternative methods of proving site impracticality, Defendants rely exclusively on Ms. Maller's March 21, 2006 site analysis, which has now been excluded.   Therefore, there is no longer any basis or support for Defendants' motion for partial summary judgment.    Consequently, Defendants' motion for partial summary judgment is denied. (Doc. 80.)

    *3.  Site Analysis Must Be Conducted During the Design Phase to Claim Site Impracticality Defense*

    While the exclusion of TWM's March 21, 2006 site analysis report is reason enough to deny Defendants' motion for partial summary judgment, the Court wishes to note that even if the site analysis were not excluded, Defendants' motion would still

---

[6] The February 28, 2007 Order issued by Judge Wilkerson discusses in great detail the background on TWM's efforts to produce a site analysis, as well as, its unsuccessful attempts to name experts after the disclosure deadline. (Doc. 110.) Therefore, that history will not be repeated here.

be denied for alternative reasons.[7]  The site analysis relied upon by Defendants was not conducted until March 21, 2006 - months after this litigation began and literally years after some of the units at Applegate had been constructed.[8] Defendants argue that the regulations and guidelines related to the site impracticality exemption do not contain an express requirement that the site analysis be completed at a certain stage of design.  While the Court would agree that the regulations do not contain explicit language regarding the timing of the site analysis, the Court finds that the plain language of the Guidelines makes it very clear that the site analysis adopted by the Guidelines should be conducted during the design phase in order to determine the number of units that must be made accessible under the FHA.  For example, the Guidelines state, "the minimum percentage of ground floor units **to be made accessible** should equal the percentage of the total buildable area of the **undisturbed site** with natural grade less than 10% slope." **56 Fed. Reg. 9503-04**

---

[7] There are no cases in the Seventh Circuit and only a handful of cases at the district court level in other circuits that apply the site impracticality defense. ***See Memphis Center for Indep. Living & United States v. Richard & Milton Grant* Co., No. 01-2069D, slip op. (W.D. Tenn. June 3, 2005); *Montana Fair Housing v. American Capital Development*, 81 F. Supp. 2d 1057, 1068-69 (D. Mon. 1999); *Baltimore Neighborhoods, Inc. v. Sterling Homes,* No. 96-915, 1999 WL 1068458 (D. Md. Mar. 25, 1999)**.  Therefore, in reaching its conclusions, the Court looked first to the plain language of the FHAA and then to HUD's implementing regulations.  Unfortunately, these two sources leave questions lingering regarding the appropriate application of the site impracticality defense.  In the face of these ambiguities, the Court has considered the intent of Congress and technical assistance provided by HUD in its Guidelines and Design Manuals to fill in the gaps.

[8] Defendants make "no secret of the fact that they applied the site analysis test to Applegate Apartments after becoming aware of the accessibility requirements of the Fair Housing Act, rather than during the design phase of the project." (Doc. 80, p. 14.)

**(emphasis added).**

It is clear to the Court from this language that HUD intended that the site analysis be conducted prior to the design and construction of any covered multi-family dwelling.  In addition, while HUD was in the process of adopting the Guidelines, it stated that it "recognize[d] the importance of establishing criteria [for determining site impracticality] that will provide a solid basis, during the design phase, for a developer's decision about providing for accessibility." **55 Fed. Reg. at 24377.**  Furthermore, HUD's Fair Housing Act Design Manual: A Manual to Assist Designers and Builders in Meeting the Accessibility Requirements of the Fair Housing Act ("Design Manual") provides, "Planning for accessibility should be an integral part of the design process in multifamily housing developments. . .This is especially important on sloping sites where careful initial planning can eliminate the need for major earthwork and the construction of elaborate ramps, bridges, lifts, or elevators to provide accessibility." (Doc. 79, Exh. 18, p. 1.4.)  HUD's interpretation of the FHA should be deferred to, as long as the interpretation is not arbitrary, capricious, or manifestly contrary to the FHA. ***See Meyer v. Holley,* 537 U.S. 280, 287-88 (2003); *Chevron v. Nat'l Res. Def. Council*, 467 U.S. 837, 844 (1984)**.

The purpose of the accessibility requirements in the FHAA was to prevent discrimination against persons with disabilities.  Unlike some other forms of discrimination, the built environment itself creates a barrier to equal access for persons with mobility impairments, which may be difficult or costly to fix down the

road.  The only way to prevent such discrimination, therefore, is through careful consideration - during the early stages of design - of accessibility concerns.  The site impracticality defense should not be a fallback defense for entities who have failed to carefully plan and consider the needs of people with mobility impairments.

Defendants' attempt to utilize the untimely site analysis amounts to nothing more than a desperate ex post facto defense.  Their argument is further weakened by the fact that the natural terrain was even re-graded, making their claim that it was impractical to make the site accessible all the more disingenuous.   Defendants argue that the impracticality defense hinges not on what is "feasible," but rather depends on the design chosen by the developer.  This is simply not true.  The regulations provide for an exemption, only if it is "impractical" to make the units accessible. ***See* 24 C.F.R. § 100.205(a)**.  To attempt to claim the impracticality defense after spending the resources to re-grade the site for design purposes, but refusing to re-grade the site to serve the needs of persons with mobility impairments, flies in the face of the very purpose behind the FHA.

As a final note, Defendants have suggested that if the impracticality defense applies that there is no requirement regarding the order in which accessible units must be built.  This is absurd, particularly in a case like this, where there was no plan from the beginning regarding the construction of accessible units and the construction of the entire apartment complex occurred in phases over the course of several years.  The first building was completed in 2002.  As far as the Court is aware, there is still not a single apartment at Applegate that complies with the FHA's

accessibility requirements.  For the Defendants to suggest that such a delay in providing accessible housing does not amount to discrimination demonstrates a lack of appreciation of the barriers persons with disabilities face in their attempt to access housing.  Therefore, even if Defendants' March 21, 2006 site analysis report had not been excluded, the Court would nonetheless find that Defendants are not entitled to the site impracticality defense,[9]

### D.  Defendant TWM's Motion for Summary Judgment

TWM asserts that it had a very limited role in the design of Applegate and was not a wrongful participant in the process as a whole of the design and construction of Applegate.  TWM posits that it was not the general site civil engineer and that it did not have a contract with the owner, builder, or architect; TWM maintains that the only contract it had was with the initial developer, OC Development, who later sold the vacant lots to Shanrie Company, Inc.  Specifically, TWM maintains that it had "only a limited role in the rough grading, location of utilities, storm water drainage, zoning, and establishing the metes and bounds of the lots." (Doc. 83, p. 8.) Furthermore, TWM argues that it notified Mr, Sheils about its concerns that the apartment buildings would not be wheelchair accessible, even though it was not TWM's responsibility to ensure accessibility, and, therefore, should not be held liable

---

[9] Exemptions to the FHA must be "construed narrowly, in recognition of the important goal of preventing housing discrimination." *Fair Housing Advocates Ass'n. Inc., City of Richmond Heights*, 209 F.3d 626, 634 (6th Cir. 2001), *quoting Massaro v. Mainlands Section 1 & 2 Civic Ass'n. Inc.,* 3 F.3d 1472, 1475 (11th Cir. 1993).

for decisions that were made that were outside the scope of TWM's contract with OC Development.  Lastly, TWM maintains that the concept drawings it prepared for the zoning proposal were never sealed, were not technical submissions, and were never intended for use in construction, and consequently, it is not liable for any violations of the FHA contained in the drawings or for violations of the FHA based on how Applegate was eventually constructed.

The United States disagrees.  The United States counters that TWM "participated actively and substantially in the design and construction of the inaccessible features at Applegate Apartments." (Doc. 95, p. 2.)  The United States argues that the plans prepared by TWM as part of the zoning proposal violated the FHA and, furthermore, that TWM knew the plans violated the FHA.[10]  Nonetheless, the United States argues, TWM proceeded to assist Sheils to obtain zoning approval for Applegate, even though TWM did not believe Applegate would be constructed in compliance with state and federal accessibility laws.  In addition, the United States maintains that TWM assisted in the siting of the parking lot, the retaining walls, and building foundations, necessary elements of features that contributed to the inaccessibility of Applegate.[11]  The United States insists that TWM may not escape

---

[10] The United States also notes that the plans TWM insists were merely "conceptual" were marked "for construction" on every page as part of the zoning proposal. (Doc. 95, p. 7.)  TWM maintains that the plans were marked "for construction" because they were copies of the plans TWM prepared for construction of the adjacent duplex subdivision site. (Doc. 98, p. 2.)

[11] TWM disputes the United States' allegation that it assisted in the design of the retaining wall for the building foundation. (Doc. 98, p. 3.)

liability simply because it advised Sheils that the design violated federal law since TWM continued its involvement with the project.

Neither the FHAA or the regulations directly address who may be held liable for violations of the FHAA. The FHAA defines discrimination as "a failure to design and construct" covered multifamily dwellings in compliance with the accessibility and adaptability design features as specified in the statute. **42 U.S.C. § 3604(f)(3).** There are no cases within the Seventh Circuit that address which entities may be held liable under the FHAA. The case primarily relied upon by TWM and the United States on this point is ***Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc., 3 F. Supp.2d 661 (D. Md. 1988)***. While this case is obviously not binding upon this Court, the Court finds its reasoning persuasive.[12]  In this case, the court held that "Congress intended the FHAA to impose liability on more than just the developer or owner in light of the broad language in the statute. . . and the fact that there is no express limitation on possible defendants in the statute like there is in the American with Disabilities Act ("ADA"), a similar statute." ***Id.* at 664.**  The court continues on to hold that when:

> a group of entities enters into the design and construction of a covered
>
> dwelling, all participants in the process as a whole are bound to follow
>
> the FHAA . . . In essence, any entity who contributes to a violation of the

---

[12] However, the Court does note with interest and some amusement that both parties cite this case in support of their assertion that TWM should not (or should, as the United States argues) be held liable.

FHAA would be liable.  By this, the Court does not suggest that all participants are jointly and severally liable for the wrongful actions of others regardless of their participation in the wrongdoing, but rather, that those who are wrongful participants are subject to liability for violating the FHAA.

**Id. at 665.**

Not surprisingly, TWM focuses on the language regarding "the process as a whole." which suggests that TWM reads ***Baltimore Neighborhoods*** to say that the entity must be involved in every stage in order to be liable.  This is not how this Court reads the case.  It is quite clear that ***Baltimore Neighborhoods*** stands for the proposition that any entity who is involved with any stage in the design and construction of covered multifamily dwellings may be held liable if it was a wrongful participant (i.e., if it contributed in some way to a violation of the FHAA).  Again, although this case is certainly not binding precedent, this Court adopts its reasoning.

Although it may be true that TWM had a limited role in the overall design and construction of Applegate, the Court is not convinced, at this point, that TWM escapes liability.  Specifically, the Court is concerned that the "ADA Accessibility" note attached to the zoning proposal might have misled the zoning board - perhaps purposefully - into believing that a ramp to the rear door could be designed  (post-construction) that would comply with the FHA.[13]  This Court is confounded as to why

---

[13] The note reads:

TWM would attach a note to the zoning proposal that suggests that the units could be made accessible in the future, when one of TWM's employees had "told Mr. Sheils that TWM refused to take on the task of drawing an accessible route to the rear doors of the apartment buildings, because it would not be equal access." (Doc. 83, p. 9.) At this point, the Court is not convinced that activities related to the zoning proposal are sufficiently outside of the overall design and construction process.  Although the Court recognizes the limited role that TWM played, the Court finds that there are too many conflicting and disputed facts, some of which require credibility determinations, that preclude the Court from entering summary judgment in favor of TWM, particularly since all factual disputes must be resolved in favor of the non-movant at the summary judgment stage.  Accordingly, TWM's motion for summary judgment (Doc. 82) is **DENIED**.

### E.  United States' Motion for Partial Summary Judgment

The United States' motion for partial summary judgment asserts that the

---

Sufficient clearance shall be retained between buildings to allow for the possible construction of a handicapped accessible ramp at a future date.  Any subsurface utilities installed between buildings shall allow for possible excavation for the construction of a sidewalk ramp between said buildings. The Illinois Accessibility Code requires that a minimum number of dwelling units be adaptable to those with disabilities.  Should an initial applicant be handicapped and desire to lease one of those units, it must be made accessible to them.  The architect and the owner have indicated that the accessible route to any such unit shall be by sidewalk ramp, at grade, to the rear door of the unit.  In order to do so, if a ramp is required, it would be constructed between two adjoining buildings, thereby allowing the potential for accessibility to the rear of both.  Said ramp shall be designed at that time accordance with the Federal and State laws, and grades adjusted accordingly.

(Doc. 95, p. 3.)

design and construction of Applegate violates the FHA and that each of the Defendants is liable for the violations. (Doc. 79.)  The United States is seeking summary judgment on the issue of liability only.  The United States' motion for partial summary judgment argues that 1) Applegate is subject to the accessibility requirements mandated by the FHA; 2) Applegate was not designed and constructed in compliance with the FHA; 3) Defendants are not entitled to the site impracticality defense; 4) each Defendant is liable for the violations; and 5) Defendants have engaged in a pattern or practice of discrimination and/or a denial of rights to a group of persons pursuant to **42 U.S.C. § 3614**.  (Doc. 79.)  The Court has already made determinations on two of these issues.  The Court held above that Defendants are not entitled to the site impracticality defense (see Sec. IV(C)).  In addition, the Court found that the issue of TWM's liability cannot be determined at this stage, as there are too many disputed facts, and therefore the question of TWM's liability must proceed to trial (see Sec. IV(D)).  The Court will consider each of the other arguments made by the United States in turn, reserving the question of specific violations for the end.

   *1.  Applegate is subject to the accessibility requirements mandated by the FHA*

   The FHA provides that discrimination pursuant to the Act includes a failure to design and construct covered multifamily dwellings built after March 13, 1991 in compliance with the accessibility features specified in the statute. ***Id.* § 3604(f)(3)**. **Section 3604(f)(7)** defines the term "covered multifamily dwellings" as "(A) buildings

consisting of 4 or more units if such buildings have one or more elevators; and (B) ground floor units in other buildings consisting of 4 or more units." It is undisputed that the Applegate Apartment complex consists of covered multifamily dwellings as defined by the statute. The Applegate Apartment complex does not contain any buildings with elevators, but the buildings do consist of 4 or more units;[14] therefore, only the ground floor units of the Applegate Apartments are subject to the accessibility requirements contained in the FHA.

### 2. *Defendants are Entitled to the Site Impracticality Defense*

For the reasons stated above in Section IV(C), Defendants are not entitled to the site impracticality defense. Except for one alleged violation, Defendants Shanrie and Sheils do not dispute the FHA violations alleged by the United States. Shanrie and Sheils proffer no other valid defense and, therefore, are liable for each of the violations found below. Defendants Netemeyer and TWM assert an additional defense, which is discussed in the next section.

### 3. *Each Defendant Is Liable for the Violations*

The United States alleges that each Defendant is liable for the violations of the FHA. Defendants TWM and Netemeyer each separately assert that they are not liable for any violations that occurred during the design and construction of Applegate. The

---

[14] As of June 2006, the Applegate complex consisted of six non-elevator three-story buildings, with each building containing twelve units. (Doc. 79, p. 17.) Therefore, there are 24 ground-floor units that are subject to the accessibility requirements of the Act. Two other buildings are planned, which would result in another eight units, which must be in compliance with the Act.

Court has already determined in Section IV(D) that there are factual disputes related to TWM's involvement with the design and construction of Applegate preventing an entry of summary judgment on TWM's behalf.

Defendant Netemeyer, on the other hand, fails to raise any genuinely disputed facts. Netemeyer was hired to provide structural engineering services and to seal the architectural plans, which contained numerous violations of the FHA. Netemeyer argues it "was hired to perform only structural engineering services, not to provide any services relative to disabled or handicapped accessibility. That was to be performed by others." (Doc. 90, p. 3.) As discussed above, liability under the FHA reaches any entity who was involved in the design and construction of inaccessible housing. **42 U.S.C. § 3604(f)(3).** Other courts have correctly found that this liability may extend beyond, for example, the owners or builders. ***See Baltimore Neighborhoods, Inc. V. Rommel Builders, Inc.*, 3 F. Supp. 2d at 655; *Montana Fair Housing v. American Capital Development*, 81 F. Supp. 2d 1057, 1068-69 (D. Mon. 1999).** In addition, HUD's technical assistance brochure entitled: "Architects and Builders, Are you in Compliance with the Fair Housing Act?" states that architects, builders, building contractors, site engineers, and any other person involved in the design and construction of residential housing must comply with the FHA. (Doc. 79, Exh. 20.) Netemeyer attempts to escape liability by claiming it was not responsible for ensuring that the buildings were accessible. The Court will not tolerate this type of finger-pointing. When Netemeyer sealed the architectural plans,

it gave its professional approval.   Entities who are involved in the design and construction of housing covered by the FHA must make it their business to ensure that such housing meets the accessibility requirements of the FHA.   Therefore, the Court finds that Netemeyer is liable for violations.   Of course, not all entities are equally liable.   Netemeyer's level of responsibility will be considered when damages are assessed.

   4. *Defendants have engaged in a pattern or practice of discrimination and/or a denial of rights to a group of persons*

   The Attorney General may commence a civil suit if he believes "that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by [the FHA], or that any group of persons has been denied any of the rights granted by [the FHA] and such denial raises an issue of general public importance . . . ." **42 U.S.C. § 3614(a)**.   In this case, there is no question that Applegate was designed and constructed in a way that totally excludes people with mobility impairments in violation of the FHA.   As evinced by the legislative history discussed above, this exclusion amounts to discrimination against disabled persons, which is undoubtedly an issue of great "general public importance." ***See United States v. Taigen & Sons, Inc.***, **303 F. Supp.2d 1129, 1138-39 (D. Idaho 2003)*; United States v. Hartz Constr. Co.***, **No. 97-8175, 1998 WL 42265 at \*2 (N.D. Ill. 1998) ("It is of course obvious that housing that is inadequately designed and constructed to serve persons with disabilities**

denies that class of persons rights granted by the Act–and. . .that 'denial raises an issue of general public importance.'  Any contention to the contrary is totally myopic or worse.")** In addition, courts have consistently refrained from reviewing the Attorney General's determination that a matter is of general public importance. *See United States v. Hallmark Homes, Inc.*, 2003 WL 23219807 at *5 (D. Idaho 2003).**  This Court agrees that such a determination is better left to the discretion of the Attorney General.  Having satisfied the "general public importance" prong, the Court need not determine whether Defendants have engaged in a pattern or practice of discrimination.

 5.  *The Design and Construction of Applegate Violates the FHA*

 The United States asserts, and the Court agrees, that the design and construction of the Applegate Apartment complex violates the accessibility requirements of the FHA.  As an initial matter, the Court believes it is worth noting the degree of non-compliance.  Applegate violates almost every provision related to accessibility in the FHA.  Except for one contested violation discussed below, Defendants do not dispute that Applegate does not comply with the FHA's accessibility provisions.[15]  It is quite apparent that at least the first six units at

---

[15] Defendant Shanrie and Sheils' response to the United States motion for partial summary judgment states, "Defendants do not dispute most of the facts supporting Plaintiff's motion for summary judgment.  Rather, Defendants contend these facts are irrelevant because the first five buildings at Applegate Apartment are exempt and need not comply with the Fair Housing Act.  But on one issue, Defendants contend that even if the first five buildings at Applegate Apartments are held by this Court not to be exempt, the existing condition is not in violation of the Act." (Doc. 97, p. 6.)  In essence, Defendants Shanrie and Sheils concede that aside from one issue, they agree that the

Applegate were constructed in such a way as to be totally inaccessible to people with mobility impairments. Defendants Shanrie and Sheils claim that "until work on this litigation began, they were not aware of the Fair Housing Act's requirements for accessibility of new multifamily housing such as Applegate Apartments." (Doc. 97, p. 2.) There are a number of facts, however, which suggest that the decision to make Applegate inaccessible was made in spite of the parties' knowledge that the housing would violate federal law.[16] Whether this was intentional or not ultimately does not bear upon the Court's finding that the first-floor units in the first six Applegate buildings violate the FHA. As noted above by the House of Representative's House Committee Report, inadvertent acts resulting in discrimination can be as devastating as intentional acts of discrimination. The FHA holds parties liable regardless of their intent.

The following violations of the FHA are undisputed: 1) the public and common use areas are not accessible to and usable by persons with disabilities because a) there are no accessible routes to the ground floor units in the first five buildings in

---

units in buildings 1-5 do not comply with the FHA; their only defense is that the units are exempt due to the site impracticality defense. However, this defense fails as discussed above.

[16] The United States alleges that Sheils was advised by a number of people that Applegate needed to be made accessible to persons with disabilities. The United States further alleges that the original design plans included accessible ramps, but the ramps were removed by Netemeyer at the direction of Sheils. (Doc. 79, p. 2.) Defendants Shanrie and Sheils dispute these facts. (Doc. 97, pp. 2-3.) ("Mr. Sheils has no memory of instructing anyone to take that route off the plans . . . .") The parties' level of knowledge or intent is really irrelevant to the Court's finding of liability at this stage. These questions go, rather, to the parties' degree of liability. Credibility determinations related to each Defendant's liability must be resolved by the fact-finder at trial.

violation of; b) the ramp to the breeze way at building six does not comply with the Guidelines regarding the maximum slope of such ramps;[17] c) there are no accessible routes to the mailboxes and dumpsters; and d) as initially built, the porch lights protruded greater than 4 inches into the walkway, there was no cane detectable barrier on the underside of the exposed stairs, and the front door hardware was know-style rather than the required lever-style;[18] 2) all of the doors for passage into and within the ground floor units in buildings 1 through 5 at Applegate are not sufficiently wide to allow passage by a person in a wheelchair and the master bedroom bathroom door in building 6 is insufficiently wide; and 3) there is not an accessible route into and through the units;[19] and 4) there are no reinforcements in

---

[17] In Defendant Shanrie and Sheils response to the United States' motion for partial summary judgment, the Defendants concede that the ramp to Building 6 does not comply, but brush it off as a "minor discrepancy": "The (undisputed) facts raised by Plaintiff with regard to elements outside those first five buildings show only a few minor discrepancies in construction that the Shanrie Defendants have acknowledged."  The accompanying footnote quotes owner Sheils at his desposition: "You guys are busting my chops because four feet of the ramp [at Building 6] out of 60 feet of the ramp has a few degrees too much of a slope."  While Sheils may feel as though the violation is minor, it is a violation nonetheless.

[18] Although the violations referred to in subsection 1(d) have been corrected, these improvements do not reduce Defendants' responsibility for violating the FHA, which requires that all ground floor units be built accessible, not made accessible only when requested by tenants or following suit by the United States.  However, such improvements may be taken into consideration on the issue of damages at trial.

[19] An accessible route is "a continuous unobstructed path connecting accessible elements and spaces . . . that can be negotiated by a person with a severe disability using a wheelchair and that is also safe for an usable by people with other disabilities." **24 C.F.R. § 100.201**.  It is undisputed that the primary entry door has level changes at the interior of the threshold of all the units in excess of the 1/4" allowed by the Guidelines and the inside threshold to the patio door exceeds the 3/4" allowed.  **56 Fed. Reg. at 9507.**

bathroom walls for the installation of grab bars. The United States is granted summary judgment on each of these issues.

The only violation that Defendants contest is the United States' allegation that the kitchens and bathrooms are not usable such that a person in a wheelchair can maneuver about the space as required by **42 U.S.C. § 3604(f)(3)(C)(iii)(IV) and 24 C.F.R. § 100.205(c)(3)(iv).**  The Guidelines provide that if a "clear floor space at least 30 inches by 48 inches that allows a parallel approach by a person in a wheelchair is provided" then compliance with the usability provision is ensured. **56 Fed. Reg. at 9511-9515, Requirement 7**.  The United States maintains that this clear floor space must be parallel and *centered* on the kitchen sink and bathroom fixtures (if a parallel approach is required, as is the case here).

Defendants Shanrie and Sheils admit that the maneuvering space is not centered, but contend that neither the regulations nor the Guidelines contain specific language requiring the space to be centered.  While the Court agrees that the word "centered" is not contained within either the regulations or the Guidelines, the Court believes that the centering is implied by both the text of the Guidelines and the accompanying figures.  Despite the lack of the word "centering," several courts have even read the centering requirement into the language, without any discussion, suggesting to this Court that other courts agree that a common-sense reading of the Guidelines would require that the space be centered, in order for the sink or fixture to be useable. ***See e.g. Memphis Center for Indep. Living & United States v.***

***Richard & Milton***, No. 01-2069, slip. op., p. 22-23 (W.D. Tenn. Apr. 27, 2004) (finding that the Guidelines establish technical specifications "including thirty inches by forty-eight inches of clear floor space parallel to or centered on the sink"); ***United States v. Quality Built Const. Inc.***, 309 F. Supp. 2d 767, 777 (E.D. N.C. 2003).

Nevertheless, the Court need not determine whether the space must be centered in order to comply with the usability requirement. As Defendant points out, the Guidelines are not mandatory; they simply provide one way to ensure compliance with the regulations.  The Guidelines are merely a safe harbor; compliance with the Guidelines ensures compliance with the FHA and its regulations.  However, if defendants do not comply with the specifications within the Guidelines, they still bear the burden of proving that they nonetheless have not violated the Act.  ***See* 56 Fed. Reg. at 9473.**  So, while Defendant goes to great lengths arguing that "centering" is not a requirement, it provides absolutely no support for its assertion that the kitchens and bathrooms are, nonetheless, useable.   "[Nonmovant's] own uncorroborated testimony is insufficient to defeat a motion for summary judgment." ***Weeks v. Samsung Heavy Indus. Co.***, **126 F.3d 926, 939 (7th Cir. 1997)** . Further, the non-moving party's own subjective belief does not create a genuine issue of material fact.  ***Chiaramonte v. Fashion Bed Group, Inc.***, **129 F.3d 391, 401 (7th Cir. 1997)**.   Bald assertions, without supporting facts or affidavits, are insufficient.  Defendants provide nothing to support their belief that the kitchens and

bathrooms are usable.  Therefore, the Court finds that the kitchens and bathrooms at Applegate are not usable such that a person in a wheelchair can maneuver about the space.  The Court grants the United States summary judgment on this issue, as well.

### V. <u>Conclusion</u>

For the foregoing reasons, Defendants Shanrie, Sheils, and Netemeyer's motion for partial summary judgment on the exemption issue is **DENIED**. (Doc. 80.)  In addition, because a genuine issue of material facts remains as to Defendant TWM's liability, TWM's motion for summary judgment is **DENIED.**  Lastly, the United States' motion for partial summary judgment is **GRANTED IN PART and DENIED IN PART.**  The Court **GRANTS** the United States summary judgment on each of the FHA violations as to Defendants Shanrie, Sheils, and Netemeyer.  However, the Court **DENIES** the United States summary judgment as to TWM's liability.  This issue, along with the issue of damages, will proceed to trial.

**IT IS SO ORDERED.**

Signed this 30th day of March, 2007.

<u>/s/        David  RHerndon</u>
**United States District Judge**