IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

Plaintiff,

v.

SHANRIE COMPANY, DAN SHEILS,
NETEMEYER ENGINEERING
ASSOCIATES, INC., AND THOUVENOT,
WADE & MOERCHEN, INC.,

Defendants.                                          No. 05-CV-306-DRH

## ORDER

HERNDON, Chief Judge:

### I. BACKGROUND

Now before the Court is the issue of devising an appropriate remedial plan to address the Fair Housing Act ("FHA") violations at Applegate Apartments. On June 15, 2007 the Court ordered Defendants Shanrie Company, Dan Sheils, and Netemeyer Engineering Associates, Inc. (collectively "Defendants") to submit a proposed remedial plan detailing how they intended to retrofit Applegate Apartments to bring it into full compliance with the FHA. (Doc. 123.) After requesting two extensions, Defendants finally submitted their proposed remedial plan on September 10, 2007. (Doc. 133.) Defendants' plan contained a description of retrofits Defendants proposed making, along with a timetable, as well as arguments as to why Defendants should be excused from remedying all of the FHA violations. The United States filed a response on October 16, 2007. (Doc. 136.) In its response, the United

States argued that Defendants should be required to perform all retrofits in a timely manner to bring Applegate Apartments into full compliance with the FHA.

On December 19, 2007 the Court held a final pretrial conference. In the course of that conference, Defendants requested that the Court withhold ruling on the remedial plan until after trial, or at the very least hold an evidentiary hearing on the issue to give Defendants an opportunity to present evidence and arguments. The United States argued that the issue had been fully briefed and requested that the Court proceed with ordering Defendants to implement their proposed remedial plan. Although the Court was hesitant to prolong the process any further, the Court decided to allow Defendants the opportunity to submit a supplemental brief *specifically* detailing what additional evidence they would offer, if the Court were to hold an evidentiary hearing and the United States was allowed to respond. (Doc. 147.) In addition, the Court directed both parties to address the newly-raised issues regarding violations at Building 7 and 8. On January 7, 2008, Defendants submitted a brief and a declaration by Defendant Dan Sheils (Doc. 149). On January 14, 2008, the United States offered a response and attached a declaration by Gina Hilberry, an expert witness (Doc. 150). The Court addresses each parties arguments below.

## II. ANALYSIS

### A. FHA Violations at Buildings 7 and 8

#### 1. Handrails at Building 7

Defendants do not dispute that handrails should be installed on the

2

entry ramp to Building 7. They argue, however, that they should not have to install the handrails until after the Court determines whether the ramp at Building 6 needs to be modified, because modifying the ramp at Building 6 will change the configuration of the handrails at Building 7. As discussed below, the Court maintains its previous finding that the ramp at Building 6 violates the FHA because the running slope of the last three feet of that ramp exceeds the maximum ANSI slope for new construction. Therefore, the Court finds that handrails at Building 7 shall be installed and configured to accommodate the modifications of the ramp at Building 6.

### 2. Accessible Route to Dumpsters

The United States asserts that there are no safe accessible routes to the dumpster that serves Building 7 and 8. The United States argues that Defendants should be required to provide a striped walkway designating a safe route across the parking areas. Defendants maintain that there is no heavy traffic or dangerous condition in the area that would inhibit a person in a wheelchair or other mobility aid from crossing the parking areas to get to the dumpster. Defendant further argues that the striping requested by the United States "would result in a maze of crosswalks confusing to both pedestrians and motorists alike." (Doc. 149, p. 3.) The United States responds that a "single crosswalk - hardly a maze - could be striped to provide access to the dumpster nearest buildings 7 and 8." (Doc. 150, p. 9.) The Court agrees that providing a striped walkway to the dumpster is the best way to

ensure the safety of disabled residents who have no other option but to cross the parking lot to get to the dumpster.

### 3. Accessible Entry Door Thresholds

Lastly, the United States asserts that the entry door thresholds were installed on a lip and, therefore, the threshold in at least four of the units at buildings 7 and 8, as measured by the United States' expert Gina Hilberry, were in excess of the ½" permitted by the Guidelines.  Defendants contend that the thresholds are ADA-approved and the only evidence they offer in support of their contention is the declaration of Defendant Sheils who posits that if there are any variations they would be "fractional" at most and within the usual and customary standards.  Although the thresholds may be ADA-approved, Ms. Hilberry found that as installed they ranged in height from 1" to 1 ½".  While this may seem like a "fractional" difference to Mr. Sheils, it would likely make a significant difference to a person in a wheelchair.  The thresholds, as installed, clearly violate the FHA and must be fixed.

### B. Supplemental Hearing Unnecessary

Defendants contend that in crafting an equitable remedy, the Court must consider "what is necessary, what is fair, and what is workable." ***Baltimore Neighborhoods, Inc. v. LOB, Inc.*, 92 F. Supp.2d 456, 468 (D.Md. 2000) quoting *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1955)**.  Furthermore, Defendants argue that the "principal limitation on the court's equitable powers is that the relief should be no broader and no more burdensome than necessary to provide complete relief

4

to the plaintiff." ***Id.* quoting *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 766 (4th Cir. 1998).**

Defendants assert that they would like to offer additional evidence and testimony on the issues of necessity, fairness, and workability. On the issue of necessity, Defendants suggest that they will offer evidence regarding settlements reached by EHOC with a neighboring property. The Court fails to see how that evidence would be relevant to this case generally or to the issue of necessity specifically. Furthermore, Defendants argue that "necessity" relates to equitable relief which will address past and future discrimination. On this point, Defendants argue that they will present evidence as to the demand and availability of accessible housing and corrective actions Defendants have already undertaken to address the violations. Again, the Court fails to see how this type of evidence would be relevant. The FHA does not provide any exemptions based on demand; therefore, even if such evidence existed, this would not be a proper consideration for the Court. Furthermore, as the United States argues, present demand may not necessarily be a good predictor of future demand.

Defendants next argue that they would like to present evidence that the United States' plan would be unworkable because it would disrupt residents and be too costly. In addition, Defendants maintain that there evidence will demonstrate that the United States' proposal is "unwarranted and excessive." On this point, Defendants suggest that the United States has an "obsessive concern" about certain violations, like the ramp at Building 6. Defendants argue that they could present

5

evidence that the United States' proposal is not workable or practical. The Court remains unconvinced as to why a hearing would be necessary on this point. Defendants have now had two opportunities (first in their proposed remedial plan and now in their supplemental brief) to offer arguments and evidence as to the most workable plan to remedy the FHA violations. Defendants have not offered a specific description of the evidence or testimony they would offer on this point. Instead, they make vague arguments as to why the United States' proposal is unworkable. This is not sufficient to justify a further hearing.

Lastly, Defendants maintain that in the interest of fairness the Court should wait until after trial, once it is determined whether Defendants Thouvenot, Wade & Moerchen, Inc. are liable, to allocate responsibility for any equitable relief. Furthermore, Defendants argue that they would present testimony regarding how the United States has treated other similarly-situated properties and the effect of any equitable relief on Mr. Sheils' livelihood. Once again, Defendants could have, and certainly in their supplemental brief, should have presented evidence and arguments on this issue. The Court has taken the evidence and arguments offered thus far under consideration when making its determination about what would constitute equitable relief in this case. At this point, the Court finds it inconceivable why Defendants have not offered concrete arguments and evidence in support of their positions. The Court believes that this is nothing more than stalling - at best - or bad lawyering - at worst. Defendants have been found liable for the violations under the FHA. At this point, the only remaining question is what equitable relief is warranted.

There is no need to delay this matter any longer. Accordingly, the Court finds that an additional hearing is unnecessary.

### III. <u>REMEDIAL PLAN</u>

In crafting an appropriate remedial plan, the Court has weighed "what is necessary, what is fair, and what is workable." The Court has also carefully considered the arguments put forth by both the United States and Defendants. The Court does not wish to insist upon a remedial plan that is so unreasonably rigid that it fails to take into consideration the totality of circumstances, thereby resulting in an inequitable outcome. It is certainly not the intention of the Court to cause Defendants an economic hardship that would be so devastating as to threaten their very livelihood.[1] However, at the same time, the Court wishes to send a clear a message that the Court takes the FHA seriously. Defendants have claimed ignorance as to the requirements of the FHA. If the Court fails to hold the Defendants to the requirements mandated in the FHA, the Court would unwittingly contribute to this "ignorance." All actors who participate in the design and construction of covered housing under the FHA must be put on notice that violations will be taken seriously and compliance will be required, even if it is after-the-fact and considerably more costly. Only by doing so will parties be incentivized to comply with the FHA from day one.

---

[1] Having reviewed information related to Defendants' financial status, the Court finds that financial considerations do not support any mitigation of the damages in this case.

Therefore, the Court rejects Defendants arguments in favor of overlooking certain violations, which they deem "minor," such as modifying the ramp to Building 6. Defendants misread the FHA when they argue that they should be required to comply with the ramp specifications of "existing" sites. As the United States points out, this language refers to properties built prior to the applicable date of an FHA accessibility requirement, not to covered dwellings that were incorrectly built after the applicable date. **See Long v. Coast Resorts, Inc., 267 F.3d 918, 923 (9th Cir. 2001)**. In addition, this Court, like other courts, rejects Defendants' proposal that certain repairs be made only if requested. **See e.g., Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc., 40 F. Supp. 2d 700, 707-08 (D. Md. 1999).** The costs associated with retrofitting an apartment if a person with a mobility impairment submits a rental application should not be part of the equation when management is considering the application. The only way to ensure that this does not happen would be to require additional monitoring. This seems rather inefficient. As the United States points out, HUD could have adopted regulations that required owners of covered dwellings to modify units only upon request rather than requiring that all covered dwellings be designed and constructed to be accessible. **See 56 Fed. Reg. 9472 (Mar. 6, 1991)**.

The last issue the Court wishes to address is the timetable by which Defendants must complete the repairs. The Court has attempted to accommodate some of Defendants' concerns in this area, while ensuring that the retrofits are

completed in a timely manner. This timetable will also enable Defendants to work out a reasonable plan for financial contribution by TWM, if TWM is found liable, as well.

Therefore, it is hereby **ORDERED** that Shanrie Company, Inc. and Dan Sheils (the "Shanrie Defendants") and Netemeyer Engineering Associates ("Netemeyer") (collectively "Defendants") shall make the following retrofits to Applegate Apartments in Belleville, Illinois, within the times specified:

1. Within thirty (30) days of this Order, Defendants shall:

    a. Provide an ANSI compliant accessible route to the mailbox and dumpster facilities by providing a no parking zone around the mailboxes and dumpsters and adding striping leading across parking lot so as to provide a continuous ANSI compliant designated accessible route (minimum 36" wide) among the building entrances and from each building entrance to the mailbox and dumpster facilities; and

    b. Purchase sufficient numbers of grab bars and surface mounted wing-its for installation of grab bars at the bath and toilet in each bathroom in each of the 20 ground floor units at buildings 1-5. (This will require purchase of at least 80 grab bars with accompanying surface mounted wing-its). The Shanrie Defendants shall maintain these grab bars and wing-its in the rental office and shall install the grab bars upon request of a tenant within seven (7) days of the request and at no cost to the tenant.

  c.  Install an ANSI compliant handrail at Building 7;

2. Within nine (9) months of this Order, Defendants shall provide an ANSI-compliant accessible route from the parking area to each of the ground floor dwelling units at buildings 1-6.

3. Within one (1) year of this Order, Defendants shall:

  a.  In the ground floor apartments in buildings 1-5, modify both bedroom doors, the master bathroom doors, and both walk-in closet doors in all ground floor dwelling units to provide a clear opening of at least 31 5/8" opening when the door is open to a 90 degree angle (see Guidelines Req. 3);

  b.  In the ground floor apartments in buildings 1-5, replace the sliding glass door at the patio with a sidelight and a swing door providing a minimum clear opening of at least 31 5/8" when the door is open to a 90 degree angle (see Guidelines Req. 3);

  c.  In the ground floor apartments in buildings 1-8, modify the thresholds at the primary entry doors and at the patio doors so that they have a bevel of no more than 1:2 and are no higher than 3/4" at the exterior side (see Guidelines Req. 3(1) & 4(4));

  d.  In the ground floor apartments in buildings 1-5, modify the bathrooms and kitchens to provide a minimum 30" x 48" clear floor space parallel to and centered on the sink. Defendants may provide the required 30"

10

x 48" centered clear floor space by installing a removable cabinet at the sink, provided that they finish the flooring and insulate the pipes under the removable cabinet (see Guidelines Req. 7(1)(b));

e. In the ground floor apartments in buildings 1-5, in bathrooms where the centerline of the toilet is not currently 16" - 18" from the side wall, move the toilet using an offset flange so that the center line is as close as possible to 18" from the side wall (see Guidelines 7(1)(a)); and

f. In the ground floor apartments in building 6, modify the master bathroom doors to provide a clear opening of at least 31 5/8" opening when the door is open to a 90 degree angle (see Guidelines Req. 3).

4. It is further ordered that within 30 days from the date of this Order, the Defendants shall provide written notice to every tenant in a ground floor dwelling that the accessibility modifications ordered by this Court in paragraph 3, above, can be installed in their unit upon request within thirty (30) days and at no cost to them, and that the scheduling of the modifications will take into account his or her preferences and convenience. Thereafter, Defendants shall make such modifications within thirty (30) days provided that all such retrofits shall be completed within one year of this Order, regardless of whether there has been a request, as required by paragraph 3.

5. It is further Ordered that within sixty (60) days, the parties shall recommend to the Court a neutral inspector, to be compensated by the Defendants, who

can verify that the retrofits have been performed appropriately. Defendants shall permit the United States and its expert, at the United States' expense, to accompany the neutral inspector, and, upon reasonable notice, to enter onto the properties to verify that retrofits have been made appropriately and in a timely manner.

6. The parties are further directed to attempt to resolve any disagreements relating to this Order before raising such matters with the Court.

**IT IS SO ORDERED.**

Signed this 10th day of April, 2007.

/s/    *DavidRHerndon*
**Chief Judge**
**United States District Court**